May it please the court, counsel. My name is James Hodges and I represent the Appalachians Jesse Abbott. Ms. Abbott is here today on three issues of alleged error committed by the trial court of St. Clair County. The first error alleged is the trial court abuses discretion by reading Illinois pattern instruction civil 5.01 to the jury with a plaintiff failed to establish the required elements of that instruction. Second, the trial court erroneously permitted the investigating officer to reconstruct the accident to the jury and finally the trial court erred in not denying the defendant's post-trial motion because the jury's verdict was not based on any supported evidence. The underlying case stems from a motor vehicle accident that occurred on May 2nd 2007 between Mr. Jeffries and Ms. Abbott occurring on St. Louis Avenue in East St. Louis, Illinois. As Ms. Abbott traveled west on St. Louis Avenue she brought her car to a stop at the intersection of St. Louis Avenue and 13th Street. At this location St. Louis Avenue is a two-lane roadway, one lane in each direction. However, the parking lanes are empty on either side of the road. The residents in that area turned this road into a four-lane driveway. While Ms. Abbott stopped in the westbound lane of St. Louis at 12th, she noticed the plaintiff, Mr. Jeffries, parked in the right lane. She proceeded through the intersection. When she came along the side, close to the side of Mr. Jeffries' vehicle, he turned left in front of her. Ms. Abbott attempted to avoid this collision by hitting her brakes and turning her wheel to the left. She unfortunately failed and the right headlight of her vehicle struck the left door of Mr. Jeffries' car. What you're reciting now must have been her discovery deposition testimony. Correct. These are the facts that were entered at the trial. On the day of this accident, Mr. Jeffries was 84 years old and Ms. Abbott was three days shy of her 91st birthday. Unfortunately, Mr. Jeffries passed away prior to trial due to unrelated health concerns. On the morning of trial, the defense presented a trial letter from Ms. Abbott's physician, Dr. Gregory, requesting that she be excused from testifying at trial due to her poor medical condition. The plaintiff had not issued a Rule 237B notice to appear and the court decided that he was not required to determine whether she needed to be present or not and did not order her to appear. Then at the end of the trial, the court read Illinois Pattern Instruction 5.01, the missing witness or adverse instruction to the jury. Illinois Instruction 5.01 allows the jury to infer that any evidence not offered but within the control of a party is adverse to that party. The record clearly shows that the defendant objected to this instruction. The plaintiff appellee claims that this objection was not specific enough and that the defendant therefore waived this issue. To support his position, the appellee relies on the case of Russo v. Kellogg. However, the one issue dealing with jury instructions in that case came from a non-pattern instruction to which a meaningless objection was made and the court felt that that wasn't appropriate. It did not pertain to a missing witness instruction. In Bernal v. Lewis, this court held that to preserve a review on an argument relating to a jury instruction, a party must both object during the instruction, conference, and set forth its objection in a post-trial motion. In this matter, the defense did just that. Before giving Instruction 5.01, the trial court must first determine that in all likelihood a party would have produced the witness under the existing facts and circumstances, except for the fact that the testimony would have been unfavorable. The facts and circumstances in this case clearly show that the defendant was too ill to attend trial per her own position, and the plaintiff did not issue a Rule 230-7b requesting that the defendant appear at trial. There was no evidence that the testimony of the defendant would be unfavorable. The missing witness instruction is only available when some foundational evidence has been presented on four elements. First, the missing witness was under the control of the party to be charged and could have been produced by reasonable diligence. Second, the witness was not equally available to the party requesting the missing witness instruction. Third, a reasonably prudent person would have produced the witness if the party believed that the testimony would be favorable. And finally, no reasonable excuse for failure to produce the witness is shown. Those are issues for the jury to decide under the instruction. Correct, but the court must consider these issues prior to the jury hearing. Of course, you're talking about whether there's some evidence which justifies the introduction of the instruction. Correct. But ultimately, the jury makes the decision. In other words, the jury is not instructed they have to make this inference. No, but the inference is pretty strong once the court reads this to the jury. It would be assumed that the court has already made these decisions. Well, it's if you believe each of the following elements. Right, correct. And it's our argument that the trial court has to also consider these before giving that instruction in order to provide a fair, balanced instruction to the jury. All right, now once the trial court indicated that this instruction would be given, did you ask to reopen Cruz to introduce the doctor's excuse? I did not, Your Honor. All right. You could have done that, correct? I think I could have. And then the jury would have had that evidence along with the other evidence in the case to determine whether or not this inference should be followed. Correct, but I was assuming that the court, prior to giving this instruction, would have recalled the initial decision that that letter was previously given and that there was no 237B and also that my next point is going to be that this instruction does not apply to a party. Just on where we're at now, though, so your argument is not that the evidence in the case supported it. You're saying there's insufficient foundational to have given the instruction at all. Correct. By failing to consider the foundational requirements of Instruction 5.01, the trial court unfairly prejudiced the defendant because she did have a reasonable excuse to not appear, namely, her previously disclosed health condition, which was disclosed well before trial and on the morning of trial. As such, no evidence was willfully withheld and no 237B-ish notice was issued, further supporting the defendant's objection to Instruction 5.01. The First District case, Nasrallah v. De Villa, distinguished cases where a defendant chose not to testify from cases where a defendant failed to appear after being served with a notice to appear pursuant to Illinois Supreme Court Rule 237B. In Nasrallah, it was held that a missing witness instruction is inappropriate where a party simply chooses not to testify on their own behalf. In this case, the defendant chose not to testify under instructions by her doctor that she was too frail. However, it was also held in Nasrallah that failing to appear pursuant to a 237B notice qualifies as willful withholding. Again, there was no 237 notice in this case, so there could not have been a willful withholding. Similarly, in the Second District, a case of Rowan v. Rittmuller, it was felt in that case by the court that it was longstanding Illinois precedent to refuse to apply the missing witness instruction to a party's decision not to testify in a civil case. The language of 5.01 creates undue prejudice upon the defendant, especially when the court and plaintiff's counsel knew that all four of the elements of the instruction had not been met. By not considering these foundational elements of instruction 5.01, the trial court abused its discretion and unfairly prejudiced the defendant. The defendant was again prejudiced when the trial court erroneously permitted the investigating officer to reconstruct the accident to the jury. Officer Harrison was not disclosed as a witness, expert or otherwise, by the plaintiff. However, she was allowed to testify, not only to what she observed, but as a reconstructing expert. Officer Harrison did not witness the collision. She was not trained as a reconstructionist. She did not take any photographs or measurements at the scene. She did not know where on the roadway the collision actually took place, and she did not use any scientific instruments to develop her opinions. She therefore should have been barred from testifying and from offering any opinions about the actions of the vehicles leading up to the accident that she did not witness. It has been held that expert testimony is only proper when the expert offers knowledge and application of principles of science beyond the knowledge of the average juror. After admitting that she was not a certified accident reconstructionist, did not see the accident occur, did not know the exact points of impact on the vehicles, did not take measurements or photographs, and did not use any scientific principles in determining her basis of causation or in reaching her opinions, the trial court still allowed Officer Harrison to tell the jury about the paths she believed the vehicles took leading up to her accident. She said it was within her discretion. Reconstruction testimony seeks to recreate an accident for the jury. Officer Harrison's testimony and conclusions considering the foundations for her opinion, the court lacked to take that into consideration. Based on Officer Harrison's own admissions, her opinions as to the cause of the accident and the paths the vehicles took was based on guess, speculation, and conjecture. An expert's opinions based on guess, speculation, and conjecture as to what she believed might have happened are inadmissible, and this has been upheld by the Illinois Supreme Court in Wadowski v. Napster. In our case, the trial court clearly abused its discretion in allowing Officer Harrison to testify about the maneuvering and paths the vehicles took preceding the accident. There was no concrete, factual basis to support Officer Harrison's conclusions and opinions, because there was insufficient physical evidence to provide her with the basic data needed to reconstruct this accident. The admission of Officer Harrison's testimony may well have tipped the scales in respect to the jury's assignment to liability against the parties. Therefore, her testimony was prejudicial. Finally, the trial court erred in denying the defendant's post-trial motion, but the jury's verdict was not supported by any evidence demonstrating negligence on behalf of the defendant. The jury was presented with only one firsthand account of how this accident occurred through the deposition testimony of the defendant, Jesse Abbott. The defendant clearly testified that the plaintiff brought his vehicle to a stop in the right-hand lane of St. Louis Avenue. This was not contested. As she was passing the plaintiff, he cut across her on St. Louis Avenue. Again, no testimony to the contrary. The defendant turned her steering wheel to the left and hit her brakes and attempted to avoid the plaintiff's car. Again, there's no testimony to the contrary. It is the jury's role to listen to the evidence and the witnesses and determine credibility. However, in our case, the jury was erroneously instructed, pursuant to Illinois Patent Instruction 5.01, to infer that this 93-year-old defendant failed to appear at trial because her testimony would be adverse to her interests. By giving this instruction, the trial court usurped the jury's role in determining the credibility of this witness. The jury's verdict in favor of the plaintiff is not supported by any competent evidence. Therefore, the defendant, Jesse Abbott, respectfully requests that this court enter judgment in her favor, notwithstanding the verdict. In the alternative, the defendant requests that the court reverse the judgment of the Circuit Court of St. Clair County and remain the case for a new trial. Thank you. Thank you, Counsel. Counsel? May I please report? Go ahead. With regard to the instruction 5.01, we have three arguments why this was not a personal error. First was, of course, the waiver issue. I do not believe that the objection that was made during the jury conference was specific enough to preserve it. Secondly, the argument that it was not error. And then lastly, it was error, but it was certainly harmless error at all. Specific objections must be made at the jury conference where they're waived on appeal. It is counsel's duty to state specifically to the trial court where in an instruction is faulty. And that's important so that the trial court can have the same similar benefit that this panel does and that we have today, without a full research and the advice of all counsel. And a post-trial motion is too late to get more specific. In addition, a specific objection is a waiver of all points not specified. And this requirement, too, is to inform the trial court of where in the particular problem lies and enables the opposing counsel, or me in this case, the opportunity to confront the objection or possibly even withdraw the instruction. And a review court is limited to the grounds presented to the trial court. And there's a disconnect between what is being argued here today and the objection that was raised in the trial court. The objection at the trial court was this. I do object, Your Honor. There was no 237 issue. Defendant is not required to be here. She was never listed as a witness on a 222 or 213 disclosure as someone the plaintiff intended to call. She offered the trial court no authority for any of those statements whatsoever to inform the trial court's decision. And nowhere in that objection that was made, and that's the only objection that was made, is a reference to 5.01 not being applicable to parties. There's no case law presented to the trial court. It is not on the notes on use in the jury instruction booklet. Under 5.01, any mention of it not being applicable to parties. And nowhere in that objection is a reference to her alleged illness or injury. I guess the instruction given is a modified form. It referred directly to the party. I'm looking at the quoted instruction in the appellate's brief. It says if a party has failed to appear within her power to do so, whereas the 5.01 says if a party in this case has failed to produce a witness. So is that right? It was geared toward the party, so it was clear who we were talking about. I think it was. I probably did gear it towards the party and made it clear as to who we were talking about. If I didn't do so in the instruction itself, it was brought up and, you know, it closed the argument. And the reason that this instruction was given I think picked up on it a little bit. There was no evidence whatsoever presented during the trial as to Ms. Abbott's alleged illness. We went through the entire trial. I didn't have anybody, you know, testifying on behalf of the plaintiff because he was deceased. His daughter was there. But we went through the whole trial, and he had an empty chair sitting over there, and there was no reference made whatsoever to the reason she wasn't there at all. And that was something that was in, I believe, the defense counsel's control. Had he mentioned that, the instruction, what the excuse was for there not being somebody there, the instruction probably wouldn't even have been offered at that point. Where was this letter? I read something about a letter in the briefs. Where was that letter? Was that in anybody's possession, like the judge or either counsel? You know, my recollection is that it did make its way into the court file that morning. Mr. Hodges brought it in, and this was before the trial. So if I look at the record, I'll find that someplace? I think it will probably be in the court file, but it won't be attached to any motion. How did it come in? There may have been an oral motion prior to the trial. So you knew about it at that point? I knew about it, yeah, that morning. Prior to trial. Right. That she wasn't going to be there. But there will be, I'm trying to wonder, where is it? It's in the file someplace. It is, and I apologize for that. Was that letter in the medical geared to the arbitration or the arbitration in the trial? Yeah. There were two letters, okay? Okay. In, I don't know if it was 2008 or 2009, prior to the arbitration of this case, James had actually filed a motion, I believe, and attached a letter from a doctor at that point in time. For purposes of the arbitration, her deposition had already been taken. We could use that at the arbitration, and, you know, I consented to a motion at that point in time that she need not appear for the arbitration only. So that was the first one. She continued to defend the case in her own name from all the way through the arbitration up to the morning of the trial. And that's when the second letter came in. And I don't know, again, I apologize for that. It's just, it's stuck in the file somewhere because I did see it as I was going through the record. The trial court at no time said, okay, you have my permission for the defendant not to appear, or any words to that effect. Right. And how that came about was the morning James brought in the letter, at that point in time, I had raised the issue because I thought I had, but I wrote through 37B motion. And so I raised the issue at that point in time. But it turned out after I looked through my file, I had not done that. So the judge, Judge Locodoco rightly said, there's nothing for me to decide then at this point in time. I don't have to excuse her because she doesn't have to be here because there is no Rule 237. So that was just kind of put off to the side and we went on to the next thing. So that's kind of how all that came about with regard to the letter making its way into the court file. I think the judges took it then and threw it in the court file. Let me ask another question if I can. Then did you introduce her entire discovery deposition or portions of it as admissions? I could only, my understanding of the law was that I could only introduce certain portions of her testimony into the trial court as admissions of a party defendant. And that was pursuant to the Rule 212 or somewhere thereabouts. And is that all of her discovery deposition that went in, what you introduced? That's all that went in. Me and James and I might have discussed it previously about what was going on. I might have included something that he wanted included as well. But that's something that we worked out previously. He didn't try to add anything to the testimony that I presented. And the testimony that I did present was that Ms. Abbott was traveling behind Mr. Jeffries in her Cadillac. She saw Jeffries traveling in front of her. This accident occurred because Ms. Abbott thought this was a four-lane road. And she thought that Mr. Jeffries was in this imaginary right-hand lane and that she was traveling in the imaginary left-hand lane. Was he on foot? No, he was... In a Cadillac or what was he in? He was in a, he had a four-desk board, I believe, and he was driving... I was getting the point. Is the Cadillac wider than a four-desk board or something? Got anything to do with it? No. Oh, okay. No. That was just, that has nothing to do with it. Well, I saw a Cadillac and I didn't know if it had some meaning. No, sorry. So anyway, her car was, she saw Mr. Jeffries' car in front of her. Mr. Jeffries lived right across the street. He was turning left to go into his parking lot. That came in through her testimony, that he was turning left to park where he usually parks. And as she's traveling in what she believes is the imaginary left-hand lane, he starts to make his turn to go where he goes every day. And the accident actually occurred when they crossed the double yellow line. And... So it is a marked roadway. It's marked with a double yellow line down the, that's the only striping on the roadway. Okay. There is no lines delineating multiple lanes. Is the roadway the same consistency or is there a brick part and then a concrete part or asphalt? Or is it just one, I don't know what it's made out of. Is it asphalt roadway? I believe it's asphalt, Your Honor. And it was the same consistency, I think, throughout there. So that's the testimony that came in was Ms. Abbott's testimony. And it was her admissions about how she viewed the lane configuration in addition to Officer Harrison's testimony. Officer Harrison testified as to her observations of the scene and to the statements made by Ms. Abbott. And Mr. Hodges has been, I think, was very vague today in what part of testimony that she gave was actually accident reconstruction testimony. None of it was. The only testimony she gave was that the location where she observed the vehicles, the fact that this was a two-lane roadway. And she also testified as to the statements made by the defendant to her at the scene. She was not asked to give any opinion testimony at trial. Her statements, her testimony were only with regard to her observations of the scene and the statements made by the defendant. And what was her testimony as to the location of the vehicles after the accident occurred? Where did they end up? Were they all in the right-hand lane? No, the vehicles ended up across the double yellow line. And Officer Harrison testified that Ms. Abbott said that that is where the impact occurred and that the vehicles had not been moved. Well, I thought that's reconstruction testimony, then, isn't it? No, Your Honor, I would say those are admissions that were made by the defendant. Oh, the defendant said it, okay. Right. She was just relaying what the defendant had told her at the scene. Back to the 5.01, if I may, just very briefly. Again, it was given based on the evidence that was presented at trial, and I don't believe there was any error in giving that instruction. The argument today that the judge did not consider the foundational requirements, again, that was not an objection that was made during the jury instruction conference. And finally, I think, given the testimony that was admitted into evidence, if there was any error in giving 5.01, if it was a harmless error, it is an evidentiary instruction. It states that the jury may infer if the jury finds these four elements. We have no way of knowing, as we sit here today, whether or not the jury relied on that instruction at all or just relied on the it's more likely they just relied on the testimony that was presented as to how this accident occurred and found the misadvice there was. Thank you, counsel. In regard to the testimony provided by Officer Harrison, the counsel asked the officer why she didn't understand her understanding of the actions of the vehicles that led up to the accident. The following testimony would therefore be her opinions and characterize as reconstruction, and as she was not a certified reconstructionist, those opinions should not have been allowed. I objected prior to her answer, and the court will rule that objection. In regards to the waiver issue on 5.01, it seems like counsel's intention is that every attorney must be familiar with every potential case to every single potential jury instruction that could arise at a trial, and that seems a little bit absurd. I believe the court has already held that just making an objection and then supporting that again in a post-trial motion is sufficient. Specifically, how specific you need to be as far as citing the exact case law. In this case, the facts and circumstances surrounding 5.01 were well known to all parties as well as the judge. Therefore, the foundational requirement should have been taken into consideration by the judge, and that instruction should not have been given. Thank you. Could you have taken her evidence deposition prior to the trial? You could have. I asked that the trial be continued or that someone else be named instead. I'm happy the letter was submitted. In other words, the letter that was submitted says, I am not in favor of this appearance in court. It says some other things, too. That's what the doctor said. Correct. But there was another way you could have got her testimony before the jury without her having to actually appear at the trial. Correct. It had a 237 been issued that we would have done that, and, again, the defendant does have the right not to testify at a civil trial. Thank you. Thank you, counsel. We appreciate the briefs and arguments of counsel. We'll take the case under advisement. Thank you. The next case called for argument is Henry Guardianship of the AGP. Counsel? Oh, wait. Let's wait until she gets set up. Good morning. May it please the court. I want to give you a brief outline of the facts because I'm sure you've already read them in the various briefs. My client is Victor Eck, who is a 50-year-old electrical contractor, self-employed. He became involved with Jennifer Greer, who's the mother of the child in this case, while she was going through a custody battle with her first child, Carly. My client felt very sorry for Jennifer in the conditions in which he found her. He rescued her as he would so many times during the course of their relationship. Together, at the time, she was living a rather wretched existence in a home with no running water, no heat, animal feces on the floor, and trash in the house. This was the same home in Marion, Illinois, from which her pending felony charges, which arise from animal cruelty. When Jennifer became pregnant with Alex, who was born on March 6th of 2007, Victor was led to believe that he indeed was the father. However, he had sufficient experience with Jennifer, based on his relationship with her by this time, to recognize that she wasn't particularly truthful, and so he took the opportunity shortly after the child was born to have a paternity test and discovered that, in fact, he was not the dad, and so he rescinded the voluntary acknowledgment of paternity that he had previously signed. However, he continued to live with Alex and Jennifer, except for the 16 times that she moved since Alex's birth and as of the trial date. Jennifer Greer has a mental health history. She has threatened to kill herself in front of the child on one occasion, and she had made a rather recent threat to her mother on the telephone when she said, what would happen to Alex if I blew my brains out? She had also made threats of suicide to her father, but these were mostly in the context of trying to get him to pay money for her support. Nonetheless, she admitted she was going to counseling, and as she put it, she wanted to stay at the women's shelter, which was her home at the time of this hearing. She was going to stay there until such time as she could get stable. She's 38 years of age. She has absolutely no employment history for the last five years, other than occasional Internet sales, hand-woven tacks, such as bridles that one makes to lead horses and put on horses, and some handmade knitted goods. Without Victor's financial assistance, she was completely unable to support herself and the child, and every time that she moved out on her own, she would end up exactly like Victor found her initially, unable to survive, unable to take care of Alex, no means to pay rent, food, utilities, or provide transportation. It was a period of three weeks that she went to jail, and during that time, Victor cared for Alex until he bailed her out. There was also the problem that whenever Jennifer moved from a place, she would often leave her things and Alex's things behind, and other people were forced to supply her with food and furniture and even toys for the child. She's banned from visiting her first child, Carly, whose custody she lost, because she was found to have seriously endangered that child's environment. She has a large child support judgment against her, and she has never paid. She's been evicted from some of the places where she lives, and she has stolen money and bounced at least one check. As I pointed out at the time of the hearing, she was a woman's shelter resident. She got there when she threatened to kill herself and to leave Alex at the police station. Victor employed the sheriff for help in finding Alex and discovered that, in fact, she was at the women's center. While my client produced about ten witnesses, Jennifer produced only two. They were from the women's shelter. There were no family, no friends who testified on her behalf. And while she was at the shelter, her witnesses conceded that she was provided with food and all the necessities of living. And under their care, of course, she was capable of taking care of Alex. Victor, who was wrongfully accused of domestic violence, was supported by his ex-wife, his daughter, and even his ex-girlfriend, all of whom came to court and testified that this man had never physically, mentally, or in any way, shape, or form abused any child or any woman. This is the same Jennifer, I think you should remember, that accused the first child's father of domestic violence but then told Eugenia Hunter, who was the guardian ad litem in this case, that in fact he really wasn't violent. They were merely arguing. My argument really only raises two points. The first is whether or not the trial court erred when it failed to grant an evidentiary hearing on the issue of standing. Obviously, the mother was the one that filed the motion. The mother made a good argument, cited to the case of RLS, explained to the judge that an evidentiary hearing was required. Then the judge turned to Eugenia Hunter, asked her opinion. She also said that the petitioner was entitled to an evidentiary hearing on standing. The judge asked whether I agreed with that, and I said that I did. Nonetheless, the judge denied the motion without a hearing, and we all assumed that we were having a hearing on the guardianship petition. That was favorable to you when the judge said, okay, I'll give you standing without a hearing. It should have been, except then at the end, when you actually read his ruling, at some point he must have changed his mind. Or that's what we infer. I mean, we don't really know. Because then all he did was reread that part of the statute, which gets us back to what you're supposed to discover in standing. Once a non-parent gets past the standing issue, then what is the burden of proof for custody? For custody in a guardianship, it's only by a preponderance. You don't have to prove unfitness? Well, yes and no. I mean, I know in your brief you cite 11-7. Yes, and there's been one law journal article on that, and it suggested that if you are a non-parent, you really have two hurdles. You have to survive the standing issue, and then you have to also focus on the fitness of the parent. And then unfortunately, of course, we have a statute that doesn't tell us what that is. Then there are also other older cases. The Adoption Act defines unfitness, at least in terms of adoption. Right, but of course, and I know you know this, Judge, but that's a whole different standard. That is why it's clear and convincing. The other problem is that there's other cases out there that suggest that really when you're doing a guardianship case and under the Probate Act, you're also supposed to consider the best interest of the child. And I felt like we were really foreclosed on this. The guardian ad litem was summarily kind of cut off from the judge. He announced that he had already made up his mind, and she had submitted a report, and the report is in the record, of course. It seems like, tell me if I'm kind of understanding here, it seems like the trial court went past standing, but then used the standing burden of proof or standard or whatever you want to call it in determining the guardianship. Exactly. Is that what it seems like? That's exactly right. Okay, now how did it hurt you, though, that you won the standing without a hearing? Well, I'm obviously trying to use it as a sword here, but the way I think it hurt us is because I don't think the trial court, when he finally made his decision that he's giving us standing, fine, but then he didn't focus on the right factors when he reached that determination because he wasn't looking at standing. At least that's what he told us. We were doing regular guardianship, and yet at the same time he didn't really look at best interest factors either, so I think everyone really suffered under that particular ruling. I was just trying to determine if you were actually, would have been, if the proper standard had been used, was it a higher standard than the judge referred to if you had to prove unfitness? I don't think it's necessarily a higher standard because I think that ultimately it's still by a preponderance of the evidence, at least that seems to be what limited case law we have would say, but, again, there's very little on this, as I'm sure you know. And, of course, my other argument is simply that assuming that the judge gave Victor standing, then the other problem is, okay, well, it would seem that his final decision is against the manifest weight of the evidence because he got into this focus on he could only consider that the evidence presented mostly acts of omission and not acts of commission, and I believe that I kind of borrowed because, again, there's not much case law from juvenile law, but definitely under the juvenile code there are many, many cases that exclusively focus on acts of omission, and, in fact, in the statute it says acts of commission or acts of omission, but he seemed to discount that. You didn't really raise it, but let me ask this anyway. How rebuttable a presumption in favor of the natural parent do you think the trial court engaged in? When I read the order, it seemed like he was implying that there was a much higher standard to rebut that presumption. There was almost an absolute presumption, and the statute indicates that it is a rebuttable presumption. Are you asking me what I think the standard of proof is to rebut the presumption? Right, yes. It's clearly by a preponderance of the evidence, and I do think he did mention that in his ruling. He did? I think he did. I could be wrong. You're not asking for a new trial on guardianship, or at least you have not affirmatively asked for that. Which I guess then would presume that there would be a trial if you won the standings in a hearing. Okay. I mean, because the relief you requested is a hearing on standing, and the other is that we just grant the guardianship petition based on the evidence to manifest weight argument. Okay. Thank you. Thank you, Counsel. Counsel? May it please the Court, Counsel? My name is Sandy Gordon, and I am the representative for the respondent of Hallie Jennifer Greer, who is the mother of Alex, the minor child from this family. The GAL found in her report that this child was healthy and well-adjusted. Public policy strongly favors the fundamental right of a parent to raise their child. By affirming the trial court decision, this Court will be upholding that important public policy by keeping Alex together with her mother Jennifer. The GAL also suggested that Victor get the child and adopted the arguments of the appellant. Is that correct? That is correct, Your Honor. However, the allegations that were latched by Victor were investigated before, not merely just by the GAL. His allegations were investigated by two trial courts. First, when he filed a petition for a plenary order of protection on these same allegations, and after hearing, was denied. Next, that same trial court asked DCFS to take possession of Alex and investigate these same allegations. And after investigation, DCFS returned the child to her mother Jennifer. Also, the State's Attorney's Office was asked to investigate these same allegations and found no need to proceed. Again here, the trial court, after two days of evidentiary hearing, determined that Alex belonged with her mother. The counsel claims that they did not get an evidentiary hearing on the issue of standing. That objection should have been made at lower court, and because it was not, it was waived. At no time during the entire two days of trial was Victor's counsel a proponent of the objection for lack of evidentiary hearing on standing. I think it's confusing what happened in the trial court. I think that's the problem. Because it seems like the trial court said, okay, we're not going to have a hearing on standing. You've got standing. Now let's go to trial. And then at the end of the trial, he said, you lose because you didn't prove what you got approved for standing. Correct. And instead of using a standard, you know, you failed to prove you're entitled to the guardianship or whatever. I mean, the language that was used was the standing language. Do I have that right? Yes, you have. So what about that? I mean, were you in trial? I was on the trial counsel. Well, was your client in trial? Was there a trial on the guardianship, or was Judge Grace actually having a hearing on standing, or is there anything in the record that would indicate that after hearing the evidence, he changed his mind on the issue of standing and said, now that I've heard it all, you clearly don't have standing. I mean, is there anything? Your Honor, an evidentiary hearing took place whereby Victor presented every witness he had, every witness he came to court with that day, knowing that he would have to prove standing. And there were no limitations on the evidence presented. There was no exhibit bar. There was no testimony excluded. There was no witness forbidden. There was no time limits. Well, when you say knowing that he had to prove standing, weren't you already past that when the judge denied the motion to dismiss? That's what it would appear on the record. But when you were there and saw from the record what testimony was elicited, what was sought, Victor presented his entire case. He didn't narrow the focus just to willing or able. He threw everything he had at this to prove that Jennifer was a bad mother. He addressed fitness. He addressed willingness. He addressed ability. He addressed her attention to health, welfare, safety, every aspect, things before the child was even born. The court had every opportunity to assess from that the minimal standard of willingness and able. So is that what the court was saying then? The court was saying, okay, now I've heard everything, and you don't even get passed first base? Yes, Your Honor. Okay. Was there any indication possibly, I mean, I haven't had a chance to look at the record yet, but was there any indication prior to the hearing that this was a combined standing-slash-merits hearing, or was it just let's hear the case? At the beginning of the record, there was some confusion whether what was going to be taking place at that time. The judge thought that the motion to dismiss had already been heard at a prior hearing, but all agreed there that it had not been addressed and that it would be addressed there. But the notice that went out to the court was for all pending, which included a motion to vacate the interim order, a motion to dismiss based on lack of standing, and the pending petition for guardianship. So it is clear that the hearing that did take place was not limited in its focus in any way. Thirteen witnesses testified about the mothering abilities, the parenting abilities of Jennifer. It encompassed all aspects. There were no narrowly drawn questions or limited focus of the testimony. And not only was it Victor's counsel questioning these 13 witnesses, it was also Jennifer's counsel. It was also the GAL. It was also the court itself actively participated in the questioning of the witnesses. Most importantly, though, when counsel claims that they didn't get a hearing, an evidentiary hearing on standing issues, they failed to allege any kind of prejudice. They claim there's prejudice, but they failed to show any fact that wasn't elicited that could make the difference in whether she was willing or unable to make day-to-day child care decisions. Let me ask you about the argument that's made by your opposing counsel, that the trial court erred in looking only at acts of commission and not also acts of omission. What's your response to that? I think that the judge in his ruling, if you check the record at that page, was just basically summing up what he found. He was not saying that because he only found this and not that, that's his decision. He was saying this is all I found, and my decision is based on it. He very thoroughly went through each witness's testimony and his assessment of whether it was given credibility. It was a very well-thought-out decision. After hearing all the witnesses and seeing all the exhibits and assessing the credibility, he found that he could find some omissions, but he couldn't even find commissions in this regard. He wasn't saying that's the reason for his decision. He was just saying what he could find from the evidence. And among the things he found, he clearly stated, was that all the evidence shows is that there's nothing but a well-adjusted, healthy 3-year-old child. The question whether the trial court's decision was against the manifest weight of the evidence is governed by the rule that taking all the evidence in the light most favorable to Jennifer, whether the opposite conclusion is the only one that could be logically drawn. Here, that is clearly not the case. After the judge hearing 13 witnesses, the majority by far of which were his witnesses, the court assessed the credibility of those witnesses and the weight the evidence should be given. And it is the trial court that's in the best position to assess credibility and weight of evidence. It shouldn't be the role of this trial court to second-guess that. The trial court's decision finding that he could not even show the minimum that Jennifer was not willing or able to make and carry out the day-to-day child care decisions for Alex is absolutely consistent with the evidence that was presented at the trial. With the other trial court finding that the plenary order of protection should be denied, that the DCFS returning the child to Jennifer's care, finding she was the appropriate party for having custody of that child, and the state's attorney with these same allegations finding that there's no need to act, there's no need to intervene, this child is not in peril. And the court's decision is consistent totally with public policy. Public policy strongly favors the fundamental right of a parent to raise their child without undue interference by third persons. All the same allegations were lodged and all the same conclusions were drawn. This child is not in peril and she belongs with her mother, Jennifer Graham. The decision of the trial court should therefore be affirmed. Thank you, Your Honor. Thank you, counsel. Counsel? I want to make it clear that Judge Grace did not thoroughly assess the credibility of each witness. In fact, one of the statements he made in his ruling was, I am not going to go through what each witness said and talk about their credibility. He did make several comments about Jennifer's credibility, and he did, I think even before he ruled, state basically that he was going to ignore anything that her father, Phillip Greer, said, because he found that he was so incredibly biased against her. But other than that, he made no assessments of the witness's credibility. The evidence that was presented by the mother consisted of merely stating that, yes, she was willing and able. Even Judge Grace found that her plans were more dreamlike in nature than reality. He questioned her ability to return to school in these times where she admitted that she owed SIU money, and SIU, as we all know, is under great fiscal restraint right now. She had very vague plans about where she was going to live. She stated that she had found rental houses, but she also said she didn't need money. I mean, her plans for the future as to how she would take care of her child were extremely flimsy, and obviously they didn't convince the trial court. The healthy and well-adjusted three-year-old, Judge Grace, gave Victor Eck great credit for producing that child. You know, Eugenia's observation of the three-year-old was brief and limited because we all had to work under this very expedited schedule. And at the time, the brief time that she spent with that child, the child looks healthy. But again, you've seen these children that come before the juvenile court. They're moved from place to place to place. Let's look at that child again when she's seven and see what has happened to her. It was not the same trial court. It was a different judge, Judge Sollerson, that asked for the investigation. And, of course, we don't know why the state's attorney did not want to proceed, and we won't know. The only other thing I would call your attention to, and I could not, I have never seen a more elegant brief, but I think the guardian ad litem's brief squarely addresses the issue of public policy. And it's only a few pages long, but it does do an exquisite job of addressing that issue. And I'm sure you will look at that again. And I don't even want to attempt to redo what Eugenia did so well here. Thank you.  We appreciate the briefs.